Good morning, Your Honors. May it please the Court, Tom Orlando for Appellant Zachary Industrial. Zachary alleges that Three Phase dropped a tool which punctured a bushing in a transformer that allowed water to infiltrate the transformer, causing arcing and an explosion. Three Phase moved for summary judgment, which the District Court granted. From Zachary's perspective, this appeal concerns the misapplication of the summary judgment standard and the failure to discern the difference between circumstantial evidence and speculation. It is very well settled that summary judgment is not appropriate if there is a genuine issue of material fact. And a genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Here, that means the issue is whether Zachary presented sufficient evidence from which a jury could find that Three Phase damaged the transformer. The answer to that is yes, which I will explore in a moment. Why are we here today? Because the District Court treated the motion for summary judgment as a trial. And here's what the District Court stated in the ruling. Quote, Zachary brought the lawsuit so its responsibility is to prove its case. Zachary's failure to prove its own case does not create a fact issue. This turns the summary judgment standard on its head. It works backwards. The plaintiff has to prove the case first, and then only when proving the case do we look back to say, oh, there must have been facts in dispute. That's not how it works. As at least one court has stated, proving or disproving factual allegations is not proper for summary judgment. Here, the District Court clearly acted as fact finder, deciding the case on the merits, not under the standards for summary judgment. Now, Three Phase, in its brief, persists in defending this clearly erroneous method for deciding the motion for summary judgment. Three Phase argues in its brief that Zachary never proved that, more likely than not, the damage was caused by a Three Phase employee during the limited days that Three Phase worked at the plant. That's on page 19 of their brief. On page 22 of their brief, Three Phase continues in referring to potential causes of the damage other than its own negligence. Three Phase contends that, quote, Zachary failed in its burden to rule out these other potential causes, close quote. That is simply not the standard on a motion for summary judgment. A non-movement does not need to prove its case on a motion for summary judgment or rule out other causes of loss. It simply needs to offer evidence from which the fact finder can reasonably find for the non-movement. Zachary has more than satisfied this burden. Let me ask you a question about the facts here. As I understand it, this transformer went in. It was lifted up, but apparently it arced and destroyed itself in a fairly short order. The determination was made that the only penetration of that container was in the top part of the hole, as I read the record. The record showed the experts who examined this determined that the cause was that water had dropped in, mixing with the oil. Of course, when it diluted the oil, it reduced its capacity to avoid arcing, and that's what happened. Accepting that for our summary judgment purposes here to be in this record, then the question is connecting that hole at the top. What does the record show with regard to who had the heavy lifting equipment around that? It strikes one as perhaps not scientific, but there's intuitively that that hole, the top of that, had to come from a blow from the top, in my scientific opinion. Hence, the question is whose equipment was there at the time? Can you shed some light on those facts? Sure. I think your Honor is on the point that was of a lot of investigation. Once that hole was discovered, how do we get the hole there? I think intuitively you're right. It had to have been from above. Zachary, my client, is the general contractor on this job, so it has access to all the records and the schedules. It knows all the work that's going on in every place. Looking at the record and the schedules, the only contractor that did any work directly above these bushings was Three Face. There is no record of anybody else doing any work. Not only were they working above, but they were specifically working on the bushing, because their job was to connect these bushings to the transmission lines above. At the point of connection, it's called a jumper or a drop. They connect the jumper or the drop to the transmission line. It drops down, basically straight down to the bushing, and then they connect it at the bushing. They do the connection first at the transmission line. They need tools to do that. There are two workers in a basket. It's a lift from the ground. I'm using motions here. It's hard for me to explain, but one of those crane lifts, they're in a basket that lifts them up. That vehicle or that lift is stationary on the ground, so it's right adjacent to or next to where they're working. They're up in the basket. They're using tools to connect this drop or jumper to the transmission lines. There's testimony from the three-phase workers that they would use some kind of tool to align the holes of the components that they have to attach. They would use a tool like a spud wrench or a screwdriver or a bullpen. All these tools have a pointy end that you can put into two pieces that have holes to align them. They were doing that work right above, about 10 or 15 feet, I think it is, above the bushing. The inference from all of those provable facts, so everything I've said so far is provable. It's provable that they were there. They admit that they were there doing the work. It's provable that they used tools. That's part of the case, I guess. It's provable that they had tools that they needed to use to do the work. All of those facts, that's direct evidence. Now, we understand and we can see that we do not have direct evidence of the tool falling from the hands of the worker. So there's not an eyewitness that says, I saw that happen. There's not a worker who confessed, I dropped my tool. There's not a surveillance video that shows that. But there's evidence to the record, expert testimony or not, that that hole had the result from a blow or penetration rather than some other deterioration or process. That's correct, and that's what our experts did. And you highlighted a lot of what our experts did. They looked at the hole, so a couple of things they had to do was determine, well, was the hole of sufficient size to allow rainwater to get in over time to dilute the oil to create the condition for the arcane? So we have experts that say yes, that that could happen, and we believe it did happen. And even three phases experts concede that that is a plausible, that could have happened here. They haven't ruled that out. So the metallurgists then also looked at the hole to see, all right, what could cause that hole? And they've concluded that the type of tools that three phase was using could cause the hole. Now, it's not clear in the record the specific tool that was used because the two were – well, only one of the two workers. Let me ask you this question. Is there evidence in the record that offers a contrary factual explanation that does not involve the explanation, that does not accept the hole as the cause, or is it conceded that the determinant here is what caused the hole? Well, I think the parties are in agreement that realistically there are only two things that conceptually could have happened, the hole with the arcane or lightning, because there is testimony, there is evidence that there was lightning during this storm. So both sides looked at the lightning. Now, this transformer was equipped with a lightning arrestor, which functions like a grounding wire or surge protector. If lightning hits, it diffuses it. Those are made or not – that will bring my personal experience. But we know, I think, it's common experience that the transformers do get hit by lightning. They do. And this has a – so they're equipped. It pretty well lights things up, briefly. So what do we do with it? Does that explain – does anyone have an offer of evidence as to how lightning would operate in that fashion? I don't – I would – my reaction is simply that, unlike a tool drill knocking a hole in it, lightning brings an electrical charge. And, of course, the whole point of arcing is simply the jumping of the current from a passage forced to jump across to the terminal – between two terminal points. When you have lightning, you get a – that is a large charge of electricity into it. So it's a different phenomenon. Well, so here's the thing. So this lightning arrestor equipment that was on the transformer has a counter, has a detector. It tells you if it's been hit by lightning. Okay. And it wasn't hit by lightning. The counter tells us it wasn't hit by lightning. You say that as if that's absolutely determinable. I mean, there's no real controversy that – Well, I don't believe there is because even one of three phases – It's not contested that your equipment shows that it was not to the extent that – okay. The equipment shows it wasn't struck, and one of three phases' own experts agrees that lightning is not a probable cause of the failure. So those conceptually were the only two things I think that the parties agreed could have happened, either the hole with the arcing or the lightning. But because the equipment says it wasn't struck by lightning, that seems to really rule that out, which is more than – But could lightning have caused the hole? I don't know if lightning could cause the hole. I don't know if anybody's made that argument or offered that evidence. But the only evidence we have is that given the type of hole it is and the metallurgist's testimony, it would have been punctured by something. So that's the evidence of the record. Yeah. Well, okay. So that gets us to the point of the lightning really has been ruled out, which, again, I think is more than my client needs to do on the motion for assembly judgment. That's a fact issue. I mean, a jury could decide is it the hole or the lightning. We've actually gone beyond that and basically ruled out lightning. So we've gone beyond our burden. As to the hole, it's undisputed the hole exists. It really is undisputed that the hole could create the arcing condition because of the water. The only issue is tying the hole back to three-phase. And again, we've established all of the direct evidence on this point. Three-phase in its brief cited some cases that deal with circumstantial evidence and presumptions. The one that caught my attention was a state court case out of Texas. It was New York Underwriters v. Trustees. And I actually think the case helps Zachary. But the court there said a presumption of fact cannot rest upon a fact presumed. The fact relied upon to support the presumption must be proved. And I think what the court is saying, you can't have multiple presumed facts. You have to have proved facts before you can get to the presumed fact. Well, in this case, we're not even really arguing a presumption. We're arguing an inference. All of the facts I've identified can be proved. We can prove that three-phase was there. We can prove that they used the type of tool that could puncture this equipment. They worked directly above it. Those are all provable facts. The inference is that they dropped the tool. That's an inference that the jury can make. And so we're not building a case on presumption upon presumption. The only inference we're making is that the tool was dropped. And that's a reasonable inference that a jury can draw from the evidence. It is not something that can be denied on summary judgment. And in the remaining moments I have right now, I do want to touch upon the last thing the district court said, which I think the parties are a little bit confused by what it meant. It appeared to us, to Zachary, that he was saying that the causal chain was broken because we didn't do the inspection. Again, it's not crystal clear. That's what the district court intended. But if so, that's reversible, too, because there's a fact question about whether we should have done the inspection, whether that would have protected it. Do you have a duty? Is that the general practice in the industry, that before you turn it on you have to say, we don't have any of that? That's a jury question, isn't it? It is a jury question. And the only evidence of record here is that that particular inspection. So remember, the bushing was inspected before 3-Phase did its work above. It was inspected by another company who determined that. It wasn't damaged in installation. It properly worked. Zachary said we don't test after that. We don't do any more testing. Now, should we have done more testing? Could it have been detected? Again, those are fact questions. Those are arguments for the jury. That should not be taken away from the jury. Thank you. Good morning. Chief Judge Owen, and may it please the Court, Russell Hollenbeck for 3-Phase line construction. I'd like to address a couple of things that my friend on the other side said, but I would like to point out that on January 27, 2017, about six days after this transformer failed, Zachary discovered a hole on the top of the bushing, on the top of the transformer. And at that point, they made the initial conclusion, oh, this was probably caused by a tool being dropped on it. They have gotten no closer as to this day as to how that hole actually got there, what tool caused it, or how the hole could have even been made. One of the things that my friend on the other side said was that they can prove that 3-Phase used the kinds of tools on this job that could have caused this hole. That is not true. The 3-Phase personnel who testified and who did this job said we did not use a spud wrench. That was the initial tool that 3-Phase postulated was the cause. We did not use a spud wrench on this work. We did not use a bullpen. We did not use a long screwdriver. That's Julian Siller. He was the welder who worked on this. The only person who testified that those could have been used was a gentleman named Don Bullock who said, frankly, I don't remember what we did. My memory is not good enough to remember anything specific about what we did on this job. How did they bolt the NEMA pad in? NEMA padding? Yes. Yes, Your Honor. Using a wrench. Using a wrench. Using a wrench. And they don't use welding because at the top you have these power lines that they're tying these NEMA pads and these drop-downs to hook up to the transformer. You don't weld up there because of the risk of burning those power lines. And that's very expensive and that would be very bad. So they use a wrench and tighten it when they attach the leads. Those drop down and those leads are then tied to another NEMA pad, which is bolted to the top of the transformer. The welding that takes place there takes place over in the basket that they're working in on this man lift. They don't do it directly over the top of the bushing. And when they're working to hook up this NEMA pad and the leads to the bushing, they're about a couple of feet. It's about chest high when they're bolting this thing on. There's no chance at that level for something to drop with enough force to put a hole in the bushing. So we absolutely reject the idea that they can prove that we used a spud wrench or a screwdriver or a bullpen up top that could have caused this. They cannot prove that. Do you have a counter-explanation for the hole? Yes, we do. And I would just close the loop on that issue to just say they did a tool check after the fact. No tools were missing and there were no spud wrenches in the tools that were being used. So that is something they cannot prove. Now, what did cause it and what we think could have caused it, which is an also equally plausible inference, is other workers in the area who were there after 3-Phase left. 3-Phase was there at the beginning of December in 2016. The transform was energized on the 15th, and it did not fail over a month later. What were the other workers doing? What were they doing that would put them in proximity to the transform? Well, we're not exactly sure because we're not in charge of all those records. But what we did get in discovery is a couple of things. One, you had testimony from Julian Siller, who was the welder who was on this project. And he said when they left, there were workers all around the doghouse and up connecting the ISO ducts that come into the back of the transformer, all around that structure. He didn't know what they were doing. They don't work for 3-Phase. They're either Zachary employees or other contractors doing their work. So there were other people there. After we left, we do know that a couple of things. There were photographs showing very tall cranes in that area and other man lifts. The sites for those photographs, which I encourage the court to look at, are in our briefing, and that's in the record on appeal. These photographs show these cranes and man lifts in very close proximity to this transformer and the other transformers. Can you go back? Did Bullock or Bowers, either one of them, say that they could have used the spud wrench? Because I know Mr. Connolly says they didn't, but it seems like there could be a fact issue there. Mr. Connolly said they didn't. Mr. Siller said they did not. Mr. Bowers was never deposed. He's a former employee. No one could locate him. Mr. Bullock said that they did sometimes use those on other jobs. But he specifically said, I do not remember whether we used them on this job or not. And he didn't do so lightly because he also testified he's a former employee. Why wouldn't that be for the jury to find him credible on that point? He might be a little defensive about it, given the outcome of the circumstances. Look, the transformer blew up here. If you'd have the tools adopted on it, the jury's going to have to make a judgment about that, you would think. Well, he said he does not remember and he cannot competently testify whether they did or did not. So it's more than just I don't remember. It's I don't have enough memory to even speculate whether we did or not. And when they did the tool check after the fact, there were no spud wrenches. The counterargument is that you didn't want to remember it because – Well, that could be a counterargument, but it's countered by the idea that after the fact, there were no spud wrenches in any of the tools that they used. And so there wasn't a spud wrench where he said, well, that's the wrench that I used. What wrench was in there? What were the tools in there? I'm sorry, sir? What were the tools in there? A wrench, welding equipment, I think a spool gun that feeds out the material that they weld with. So that's – but there were no spud wrenches, no bullpens. I don't think there was any long screwdrivers either because those things were all checked after the fact. But in terms of what else we know was going on is that we have electrical line proximity permits for the days after, beginning December 12th, for almost two weeks. Every single day, with the exception of Christmas Eve and Christmas, for 12 hours a day, there were at least two cranes parked right next to this transformer, right between it and another one. The importance of the proximity permits is that if you're working anywhere within 20 feet of these lines that go directly over these transformers, you have to have a permit. So we know they had people working there. We know they had cranes, very tall cranes, which you can see in the photographs that we – many, many stories above this transformer. It's equally plausible that something could have fallen off of one of these cranes and landed on it. And that's important because at no point do Zachary's experts say a three-phase employee must have dropped a tool. The closest they get is they say, we believe it was a tool or some other similar small object. So all we know is it's a small object. Can you help us? I am confused as to whether the district court did not use the expert reports. The district court did its usual terse order opinion in this case. And I'm not clear as to whether or not the expert reports were considered. Are you clear on that? I'm not 100 percent clear on that. We did object to the expert reports themselves. Right, but you objected that they weren't sworn. But they don't have to be in admissible form now under the new rules. It's been several years now, I think, that they can be – as long as they could be put into admissible form, then that's not a valid reason to not allow them. Well, we also had the expert testimony. There was extensive excerpts of testimony provided to the district court by both sides. And their testimony explains that they were not able to determine – that none of Zachary's experts were able to determine what kind of tool could have actually made this hole. You can test certain tools and drop them and say, okay, they land with a certain amount of force that's sufficient to puncture an aluminum plate. We know the thickness of the aluminum. We know the grade of the aluminum. So should we use that – should we use all of the expert – the competing – the expert comments in deciding whether or not there was valid summary judgment here, evidence here to overcome – evidence to overcome summary judgment? Or should we ignore the experts? I'm trying to figure out what are we supposed to do. Well, I think you should carefully look at what the experts are actually saying because what they're actually saying is we can't tell what kind of tool it was. We think it was a small object such as a tool. And they did no testing to determine what kind of tools could have caused this. All it is is theory. They have their test. I'm sorry? They have – they're using your test to some extent. Well, they're trying to use our test to criticize our test. Our experts – it's not our burden to prove how this could or couldn't have happened, but we're just showing that, look, you can test this. And so they got the same grade and thickness of aluminum. They put it on a stand. They bolted it in six different places to make it as firm as possible, and they dropped a spud wrench from 12 feet and 15 feet, and they guided it, as you can see in the videos that we provided, point down straight into the sheet, and it didn't puncture it. Now, we don't know that that is exactly how this hole got made, but that's their theory. And so we tried to test it, and it didn't work. Their response is very interesting. Their response is, well, it's not the same circumstances as in the field, and that they can't do a test that validates the same circumstances found in the field, which raises the question, how are they going to – how do they prove their case? They can't prove that a tool can actually do this, and there's no proof that we actually used a tool that could do this. How do they prove this case? This is a lot like circumstantial cases that the Texas Supreme Court has addressed. For example, the Walmart versus Gonzalez case, which was the macaroni salad case. In that case, the Supreme Court looked at a circumstantial evidence case on legal sufficiency grounds, which is what we've got here, and they said meager circumstantial evidence from which equally plausible but opposite inferences may be drawn is speculative and thus legally insufficient to support a finding. In that case, again, it was a question of circumstantial evidence when the item got on the ground. Do you find from the abundance of the evidence that it's more likely that – that's what we – that's what a jury would be put to do. Do you find from the abundance of the evidence? It's got to be more likely than not. It's got to give you something that gets you over the hurdle. If it's equally plausible, it doesn't get you there. What about the fact that the oil cap has a small indentation in it? It actually has the – it's been described as having the indentation that is most consistent with the spud wrench. Which one, the one that fails? The oil cap, which – Yes. The oil cap shows the downward indentation, which is the size of a spud wrench. So you can just take the spud wrench and put it there, and it fits like a – Yes, and that has been their theory all along, except we didn't use a spud wrench. Well, we don't know whether you used a spud wrench. Because you normally do use a – your client normally does use a spud wrench or frequently does, and they testified to that. No, Your Honor. Our client testified that they use a spud wrench when they're hanging steel and when they're needing to line up steel. We did not testify that we use a spud wrench in this operation or ever use a spud wrench in this kind of operation. Let me ask you a question, though, moving away from this issue, which obviously is a critical one. What kind of money are we talking about in this case, these transformers? I know they're expensive, but what are we talking about? I think the range of damages, if I recall correctly, is between $4 million and $6 million, determining the cost of replacing the equipment and I think possibly some lost time as well. And this case comes up on subrogation. So – but I would get back to what these electrical proximity permits show is that you've got a two-week span of time in which there were other operations going on within 20 feet of this transformer and way above it. If you look at the pictures and see how tall those cranes are, there are many, many stories about this. Talk about the inspection for a moment that – You say within 20 feet. Was it 20 feet above it or 20 feet on either side? I don't exactly know. It's a within-20-feet proximity permit. There's a box on the permits that say, are there operations that are going to be taking place within 20 feet of the power lines? The box is checked as yes. So it could be above, it could be next to it, it could be as they're lifting things above and over. And again, we're not in charge of all those records because we're already gone two weeks before when all that work is going on on the other parts of the plant and the parts right next to this part of the plant. Why do we think the inspection that Zachary didn't do prior to energizing this transformer is important? It broadens the timetable of when this hole could have happened. For example, say you've got a circumstantial case where Zachary goes out and does the inspection. Okay, now you're about a week after our guys are there. If they find the hole, that's a much stronger circumstantial evidence case. I will give you that. They didn't do it. Their experts said this hole could have actually happened as late as December 31st, given the rainfall would have been sufficient rainfall to cause the failure of January 18th if the hole was caused by somebody else at a much later time, almost a month after our guys were there. That's why we think the inspection is important. We didn't move for summary judgment saying we win because they didn't do an inspection. I think it's important for the reason that it broadens the timeline. It also kind of puts the wood to their argument that, well, they have a written tool tethering policy, and 3-Phase doesn't have a written tool tethering policy, so our guys must have dropped a tool. They have a written policy that specifically says the inspection they're supposed to do. They didn't do it. Outside consultants say they should do it. It is industry standard to do it before you energize. They say, you know, we don't do it. We disagree. I think all that shows is that just because you have a written policy doesn't mean your employees are going to follow that policy. Somebody said the policy says to do it earlier. Well, they do. It is done when it's installed, right? The installation company comes out. They inspect it, make sure nothing's broken. They put it in place. They inspect it at that point, and it's done. But that was back in August, I believe, of that year, so many, many months before this happens. Their outside consultant says, no, it's industry standard. You inspect it. We're not saying we win because they didn't inspect it. I'm saying it shows that the timeline is much broader. This isn't a narrow circumstantial evidence case. Some of the cases they cite supporting circumstantial evidence possibilities or plausible outcomes are things like they're much, much narrower. You have, for example, the case from this court, I believe the Kellogg case. I'm sorry, Ketcham, where three men are arrested after a high-speed chase. Within minutes, the officers – and they found marijuana residue in their car. Within minutes of arresting them, the officers find a bag of marijuana along the same route. That's some circumstantial evidence that this marijuana belonged to those men. In the State Farm v. Davis case that they cite, there was a question of coverage as to whether one of two people in an automobile was a passenger or a driver. They did forensic analysis of the vehicle after the accident. They found biological evidence supporting the fact that this particular person was in the passenger seat. And that's circumstantial evidence to show that he was not the driver. Same with the Burlington – I'm sorry, Prudential v. Crater case. It was a life insurance policy case. The question was about whether the gentleman had committed suicide. He's found in his car a single gunshot wound to the temple and a gun in his lap. And they said, well, that's circumstantial evidence to show what happened. Here, there is no circumstantial evidence that's strong enough to get them past a summary judgment. There's evidence about the nickel scratches on the surface of the bushing. That was a theory that their experts latched onto pretty early on. And it shows some scratching right around the area of where the hole was, and there's this little flap where the metal goes down. Well, when they found out that we don't use nickel-coated or nickel tools at all, they abandoned that theory. Now, had our men used nickel-coated tools or nickel tools, that would have been some pretty strong circumstantial evidence that I think would get them past summary judgment. They don't have that here, so they abandoned that theory. Those are the kind of cases where I think circumstantial evidence can get you to a fact question. What you have here, this case is much more like the Walmart v. Gonzalez case, a Ford Motor Company v. Ridgway. That's another Texas Supreme Court case dealing with an automobile fire, where it affirmed a summary judgment because the evidence was not sufficient to raise. Even though it was circumstantial evidence, it was not sufficient to raise a significant material fact question to defeat summary judgment. And as the court in Walmart v. Gonzalez said, the harsh reality is that if a plaintiff cannot prove his case, there's simply no cover. Zachary cannot show anything other than a small object, possibly a tool, could have caused this hole. They've done no testing to show what kind of tools could have caused it, what height from which they would have to be dropped to puncture this aluminum bushing or anything like that that gets them past summary judgment. So, with all due respect, we would ask that the court affirm the district court's summary judgment and favor it three-phase. Okay, so did Mr. Bullock not say that they used a spud wrench or spud to line up the holes? I believe what he said is that he did not remember whether they did on this job. That is what he said when he was asked the question. I'll look again at 921. Okay. Thank you. Yes, ma'am. I don't know directly where I was going to go, which is the testimony is Mr. Bullock noted that they used a bullpen or a spud wrench to line up the holes of the NEMA pads. The foreman, who was down on the ground and wasn't up there, contradicted that and said, well— Was he saying on this job or was he saying in general we do this? I think at one point he said on this job, and then at another point he said, I'm not sure, I don't remember. So his testimony waffled a little bit, but at one point he said they used a bullpen or a spud wrench to line up the holes. His foreman contradicted that to say, well, no, I think they would have used a screwdriver for that purpose, not the bullpen or the spud wrench. Is this the foreman who was in the truck? So remember, we're the general contractor, so when this first happened, we would not have known specifically what tool was used. Discovery has, in the FACT investigation, pointed out that they would have used a tool that has a pointy end to line up the holes that could have punctured it. There's certainly enough evidence there to get past summary judgment. What about the other baskets that were in the truck? You had some evidence, I thought, that it tended to exclude the possibility that something fell out of those baskets. That's right. So counsel mentioned the isoduct work that actually my client was doing. That was behind and below these bushings. So to Your Honor's questions earlier, in order to get this puncture on top of the bushing, you have to be doing something above the bushing that's going to make that hole. The work that was done on the isoducts is many feet below and behind the bushing. So that work was never above the bushing. So you cannot say it's equally plausible that that work and three phases work could have caused this. The irony of this case is that the most speculative causes are the ones that three phases advance. That's very speculative that somehow my client's work on the isoduct, which is below the bushing, could have caused the hole on top of the bushing. Same thing with the cranes. The crane work was not actually done within 20 feet of these transmission lines. The box was checked, and I believe the person was asked at the deposition, why did you check that box? Well, the answer was, well, we normally do that because we know we're not supposed to be within 20 feet and we want to be sure we follow all the protocols. But if you look at the evidence of record as to where the crane was and the work that the crane was actually accommodating was on the other side of the transmission wall, they wouldn't have been anywhere near these transmission lines with the crane. They didn't need to be. There's no actual evidence that they were. There's no evidence when something happens with a crane, when a crane falls or at one of those giant boxes that is going up on a crane, if that drops or falls, there's going to be an incident report. Somebody is going to know that something like that happened. And there's no evidence of that. So, again, it's speculation. Well, does a box have to drop for a tool to fall out of it? There's no evidence that there were those kinds of tools in those boxes that could somehow, those boxes are on those cranes that are designed to lift them straight up so that they're not tilted so something doesn't fall out. Was there evidence that there were no tools of that kind in the box? I don't believe there's any evidence as to what specifically was in the boxes. But all of this stuff is for the jury. All of these are three-phase to make all these arguments about these alternative causes, but they're less plausible than the one my client has advanced, and I think that's what's critical for the summary judgment motion. The issue about the inspection broadens the fact that we didn't do the inspection broadens the timeline. That may be true that it theoretically broadens the timeline, but it's okay. We still have to look at, well, who was working above the bushing during that time, during the broadened time? And, again, the only evidence we have is that it was three-phase who was. After three-phase did the work, there's no evidence that anybody was working directly above the bushing. So we've satisfied that. The experts, there's the brief. Ampley's brief seems to point out that or take issue with the fact that our experts couldn't say, well, it was a three-phase worker that did this or a three-phase tool versus somebody else. Well, that's not what a metallurgist is going to do. He wasn't asked to do that. He couldn't possibly do that. He's simply determining whether a tool of the kind that three-phase used could cause the incident. If there were three different parties using those tools above the bushing, the expert's not going to, this kind of expert's not going to be able to say who it was. That's not a flaw of the expert's analysis. I see my time is up. Well, let me just say that if we should decide that it's to be tried, I hope you will plead with the district judge to put at least 10 jurors in the box. We're trying to get those things. A lot of the district judges have forgotten that, some of you don't know that it is permissible to put 12 in the box. And most around the country, they're moving to 10. It's in both your interests if the case has to be tried, and both of you are very fine advocates to do that. It has nothing to do with the specifics of this case other than it's a tough case, and if it's to be tried in a jury, I would want at least 10 in the box. Thank you, Your Honor. Keep that in mind. And I'm not a complete stranger to that. Thank you. Thank you, counsel. That will conclude the arguments of this panel for this week. Thank you.